[Crim. No. 4082. In Bank.—April 27, 1937.]

THE PEOPLE, Respondent, v. JOHN D. McNEILL, Appellant.

No appearance for Appellant.

U. S. Webb, Attorney-General, Warner I. Praul, Deputy Attorney-General, and Earl Redwine, District Attorney of Riverside County, for Respondent.

SEAWELL, J.—In an indictment returned by the grand jury of Riverside County, the defendant was charged with the murder of his wife, committed on August 13, 1936. At the conclusion of the trial, the jury brought in a verdict of murder of the first degree without recommendation, and sentence imposing the extreme penalty was pronounced.

While ably and vigorously represented by counsel upon the trial, no appeal has been noticed by the defendant. The cause comes before us under the provisions of the commonly designated "automatic appeal" statute. (Pen. Code, sec. 1239.)

It appears that at the time of the homicide the defendant and deceased had been married approximately twenty-five years. There were four children of the union aged, respectively, 13, 15, 17 and 19 years. Deceased was 49 years of age and defendant was 52. On the day upon which deceased met her death the parties were living in the town of Temecula, where the defendant was engaged as a blacksmith and deputy constable. The evidence is undisputed that some time between 12 and 1 o'clock on the afternoon of August 13, 1936, the deceased was the victim of a brutal beating about the head and body that caused her demise several hours later. The autopsy surgeon testified that his examination disclosed five ragged lacerations, varying in length from three to four inches, on the head of deceased, some of which made visible the skull bone. She also bore a bluish spot in the pit of her stomach under which the "crackling" of broken bones was discernible. The cause of death was described as shock resulting from the skull and abdominal injuries.

By means of the testimony of several disinterested witnesses the prosecution placed defendant at the scene of the assault at or about the time of its commission. Three neighbors testified that they saw the defendant in the immediate vicinity of his home and approaching the same a few minutes prior to 12 o'clock on the day of the homicide. One of these witnesses described defendant as wearing overalls, which were subsequently found to be spattered with blood. Another disinterested witness testified that he heard a woman's screams emanating from defendant's home at approximately 12:15 on the day in question. He described them as continuing for a period of three or four minutes. A young high school boy for whom defendant had been making a hunting knife at his blacksmith shop, not finding defendant at the shop, approached defendant's home to inquire about the completion of the knife. As he neared the house shortly after 12 o'clock the witness could see the defendant pacing back and forth in the living room. Upon discovering the presence of the

witness outside the house the defendant went out and discussed the knife with the boy, who then left.

The seventeen year old son of deceased and defendant testified that on the day of the homicide he came home to his lunch between 1 and 2 o'clock; that he was met outside the house by his father, who told him "somebody had beaten up my mother"; that he rushed into the kitchen and found his mother lying on the floor, bloody and apparently unconscious; that he attempted to assist his mother; that blood was scattered about, some of which had been wiped up; that he noticed a drop of blood on his father's eyeglasses; that defendant said it must have been a prowler, adding, "Come here and look," whereupon the witness entered a bedroom and noticed the drawers of a dresser pulled out and a trunk open; that a lady's purse lying there still retained its contents of money; that a gun which he noticed on the dining room table as he first entered the house with defendant had disappeared after the witness threatened to kill the person responsible for his mother's condition and was later found under a scarf on a dresser; and that he (the witness) went to summon medical and police aid.

The doctor who responded to the summons for aid testified that he found the deceased lying on the floor in the kitchen and attempted to aid her. He then related the substance of a conversation had with defendant between 1:40 and 2:10 P. M. in which the latter charged the assault to a prowler, pointing out, in substantiation thereof, the open dresser drawers and the open trunk. On at least three other occasions shortly after 1 o'clock on the day of the homicide, the defendant repeated the prowler story to as many disinterested witnesses.

A deputy sheriff who arrived on the scene at about 3:30 in the afternoon disclosed that two blood-stained house aprons were found in the cow barn and a bloody rag discovered under a rabbit hutch. The witness also testified that further search uncovered two hard rubber rollers from a clothes wringer, one of which had blood on it. They were found in a covered wood-box in a corner of the porch. When the witness informed defendant that he would have to take him to jail, defendant made no reply. Before leaving, the defendant removed a loaded revolver from a dresser drawer, stepped back and started to turn when the witness took the gun from him.

Six days after the homicide the defendant for the first time advanced an entirely different explanation for the assault and resulting homicide. This new version was thereafter related by defendant on several occasions to peace officers and was the story told by him when on the witness stand in his own defense. In short, defendant narrated that when he came home to lunch shortly after 12 o'clock on the day of the homicide the deceased upbraided him for not having sufficient money with which to pay the premium on a small life insurance policy; that she addressed a vile epithet to him and pointed a gun at him which she held in her left hand; that she threatened to kill him; that fearing injury to his person he picked up a hard rubber roller from a clothes wringer and threw it at the deceased, striking her on the side of the head; that he threw a second and similar roller at deceased and struck her in the stomach; that she then dropped the gun which he kicked aside; that he again picked up one of the rollers and struck deceased over the head; that everything then ''went blank''; that when he recovered his bearings he was standing outside the house; that he came in and held deceased in his arms; that he threw the rollers into the wood-box on the porch, picked up and wiped off the gun and wiped up some of the blood on the floor. The defendant was the sole witness for the defense.

There was medical testimony to the effect that deceased's left hand, the hand in which defendant said she held the gun, had been crippled for several years. The nineteen year old daughter of the parties testified that deceased's left hand had been operated upon and for four years had been crippled in such a manner as to preclude her from picking up or gripping an object with the left hand.

█ The foregoing is a fair summarization of the evidence. We have read the entire transcript of the proceedings in the court below, and have examined the rulings and instructions of the trial court. We have found nothing that even approximates prejudicial error. The jury was fully and correctly instructed on all pertinent matters, including self-defense. It was given five forms of verdict and instructed on each. In view of defendant's conflicting stories descriptive of events culminating in the death of deceased, and particularly in the light of glaring weaknesses and discrepancies in his self-defense theory, we are satisfied that the jury, under the evi-

dence, acted well within its province when it impliedly found that the death of deceased was wilful, deliberate and premeditated so as to constitute murder of the first degree, warranting, in the discretion of the jury, the imposition of the extreme penalty.

Judgment affirmed.

Curtis, J., Edmonds, J., Shenk, J., Thompson, J., and Langdon, J., concurred.